And we'll proceed with Yun v. Ethicon. Robert Whitworth for the appellant. First of all, thank you for a long morning of very complicated arguments and your indulgence in this matter. For your view, this is a personal injury matter that's related to products, liability  issues, and I'm not going to go into that.  And I'm not going to go into that. Counsel, look to me like you had enough to get to the jury, maybe. But I can't see why you – well, no, I misspoke. I don't exactly see why there's enough so that a jury could decide that contaminated sutures from Ethicon caused the infection. Your Honor, I think the crux of this case is that my client can show there were contaminated sutures in that hospital. They cannot show they removed a single suture. They cannot rely on the recall notice. There's the problem of the signature on the compliance with the recall notice. Yes. But it might be – the ideal thing from a plaintiff's standpoint is if there was something fraudulent about that to deal with the litigation. But it could also be just somebody signing for somebody else innocently. Well, they haven't established anything other than that, Your Honor. Well, they have, though. They say they go through an enormous amount of sutures. So even if they never complied with the recall notice at all, it looks like they could well have gone through all the sutures that could have been contaminated. What's more, we don't know that any of the ones that they had were contaminated. The sutures that were used on this man, there was evidence, as far as I could see, uncontradicted that it was synthetic sutures. That's true, Your Honor. But it's also true that there were contaminated sutures in the general medical supply at the time. And even though there may be a possibility – and the information we understand is that the recall went on for some time, even beyond that claimed in the notices that we contend have arguably forged the signatures. So there was some discrepancy, if not questionable methods used in their recall methods. Let's say that you've got a genuine issue of fact on whether some of the recalled sutures remained at the hospital. You still have to show that there's a genuine issue of fact on whether contaminated sutures caused the infection. And that's where I'm having – where I'm really hanging up. And, Your Honor, I think – and this goes to what my argument is, and this is what the trial court position was, that we couldn't show that Mr. Young, by direct evidence, received an infected suture. Now, we can't, and that's because of the way their system is set up. Mr. Young is just a man who went and had surgery. The way they set the system up, there's no way to track what sutures were used in his surgery. You can't track them by lot number or whatever other reason or method there is. So that's just the system, and that's not created by my client. That's created by Ethicon and the medical industry. I'm thinking we don't even know if the infection came from sutures at all, though. We know it's this odd bacteria, this morganella. But as I understand it, you find that in sheep and cow intestines, which are not used for the sutures, and it's also in human feces sometimes. Correct, Your Honor. And that means some poor contamination by somebody involved in cleaning the surgery room or one of the doctors or nurses or any number of people. I understand that, Your Honor. And what the trial court said is you can't show by direct evidence he received an infected suture. We contend the circumstantial evidence in this case. Or that he even got his infection from sutures. Well, I think the testimony of Dr. Lowe is pretty close to saying, you know, he got that infection originated in the area of the sutures. Well, sure. That was the area where the man was cut open. Pardon? That was the area of the surgery. But it wasn't the surface of the skin. I mean, he got the area of the vicral sutures is where that infection started, and we know that vicral sutures were out in the medical community or supply. That area is also where the instruments to sew the sutures into the tissue were used. Granted, Your Honor, but I think the circumstantial evidence in this case is enough to get to a jury. Let them decide. This isn't for a court to decide whether this man was infected by something other than these infected sutures that were out there in the medical community at the time. It's also where the gloves of the doctors who were sewing would have been touching the tissue. I understand that, Your Honor, but I think that's a question for a jury. Well, I don't know if it is, unless you've got some evidence from which a jury could conclude that the contaminated sutures from this manufacturer did it. In that case, Your Honor, our argument is that the burden should really shift to the defendants in this matter. There's no way to prove that because they don't create a way to track these sutures to see if a contaminated suture was used. Counsel, what's your best case authority for that burden-shifting argument you're making? Actually, it's a case cited. It's the Sanders case, which I agree with in part and disagree with in part, that they actually do not end up shifting the case, but it's probably a Summers v. Tice case. You know, this defendant had contaminated sutures out there. Our client suffered, you know, an infection, a life-threatening infection of the type that these sutures caused days after a surgery. I think the circumstantial evidence is such that the burden should shift to the defendants to prove that they didn't cause this injury. Of course, if the hospital didn't keep the records, they can't prove it either. It's not just the hospital, Your Honor. I think that, from what we understand, nobody keeps these records. Once they go out, they go out. Now, when they went to recall them, you know, they could identify lot numbers, but they couldn't identify what lot numbers were sold to what specific. They don't track them. They don't track that. I mean, it's a consumer matter, and it's inherently unfair to make a consumer say, yes, I can show this exact bad thing was put in my body by this producer. I notice that the hospital goes through 40 boxes of sutures a month, a lot of sutures. What evidence is there that even if they didn't comply with the recall, that there would still be any of the contaminated sutures if they were contaminated around? Your Honor, we don't have that information, but given this is a summary judgment motion and this should go to a jury, I don't think that's true. You don't go to a jury without evidence. Well, they didn't prove they removed a single suture. They couldn't. They say they use a lot. They say we go through 40 boxes a month. It gives rise to an inference that even if they kept all of the contaminated sutures, they would all have been used up before they ever got to Dr. Young's surgery. Well, Mr. Young, he's an attorney, but there's no evidence of how many were ever sold to the hospital. I don't think that was ever admitted. We don't know how many were sold to the hospital, and they don't actually say how many were left in the hospital. They just say that, you know, we have these recall notices, and then when we deposed the nurse that was supposedly in charge of the recall, she said she'd never seen the things before. The nurse said that it came from the sutures because they were gut, and gut from that animal is where you get morganella. But it turned out she was wrong. They were synthetic. That was, yeah, someone that was helping us and was wrong in her determination. But the nurse who was in charge of the supply for the hospital testified that the documents that the defendants showed us, showed them, she'd never seen before. She didn't know what those were about, and she'd never signed them, even though it had her purported signature on it. So, and I think the trial court recognized, you know, Ethicon cannot show they recalled a single suture from that hospital. So we have to presume it's possible that there was contaminated sutures in that hospital. The circumstantial evidence is substantial that my client suffered an injury of the type at the time from this type of an incident. And I think this is really a question for a jury. I think it was an improperly granted motion for summary judgment. Thank you, counsel. Good morning, and may it please the Court. Alan Lazarus of Drinker, Biddle, and Reith for Defendant Ethicon. There's four main reasons why I think the district court was correct here. Number one, there was no evidence to support a reasonable inference that the sutures that were used in Mr. Young's surgery were within the recall population. Number two, even if there had been sufficient evidence to show that the suture was within the recall population, the fact of the matter is merely being within that population does not raise any inference that the suture itself was contaminated, given the fact that this was a precautionary public health recall, which was premised on the assumption that some of the sutures within that population might be contaminated. Third, there are other causes of infection, as was alluded to during the argument. I'm going to get back to your first point. There was evidence that I think they used about 40 boxes of sutures a month at that hospital. Was there any evidence of how big a stock they kept on hand? No, there wasn't. I think that the evidence was that they had a fairly steady stream of ordering 40 boxes every month. See, if you have an inventory of 1,000 boxes and you order 40 a month, it doesn't necessarily mean you would have used up the sutures that were within the recall. If you order 40 boxes a month and you keep an inventory of 100, you almost certainly would have used up long beforehand any sutures that were subject to recall. But we don't know the size of the inventory. That's correct, Your Honor, and I grant your point. But on the other hand, ordering 40 boxes a month would not make much sense if you had so many in stock. That's right. It's expensive to keep inventory. And I think there was also evidence in the record, some of it coming from Nurse Garcia herself during her deposition, that, in fact, there was a fast turnover rate at the hospital and that they went through these things very quickly and used a lot of sutures. So I think the 40 boxes per month logically indicates that that was what they needed to keep their stock. Fast turnover meaning fast turnover of sutures. That's right. Is that what you're saying? That's right. As I said, the third point is that there were other possible causes. And one of the traditional ways of proving causation in a products liability case, including a medical causation case, is to rule out the other possible causes. And, of course, that wasn't done here. There are many other causes, possible causes of infection, besides contaminated sutures and certainly the contamination and the bacteria involved in this case. In other words, there was no signature disease here or signature bacterium that's been associated with this contamination problem in these sutures. And, finally, the opinion of Dr. Lowe, putting aside what we think are drastic foundational problems, simply did not support an inference of causation. His opinion, if accepted, that the infection occurred in the area of the sutures for the reasons that were stated just a minute ago is really meaningless. It doesn't prove anything in terms of the sutures actually being the cause of the infection itself. Now, not within the recall population, there was compelling evidence that this suture was not within the recall population. There was an eight-month gap between when the recall was issued and supposedly complied with by the hospital and the surgery. There was evidence that Mercy actually did comply, and that being the recall documents that were questioned by the appellant. And then, finally, there is that high turnover rate that we just discussed. Now, Judge Breyer took a conservative approach and assumed that it was possible that the sutures were not removed during the course of that recall in October of 1994, but found that, even assuming that, there still was not a reasonable inference that a contaminated suture was used during the surgery. And he was undoubtedly correct, that even indulging that assumption and giving the plaintiffs, the appellants, the benefit of that assumption, that it still wouldn't get them to where they needed to go to defeat the summary judgment motion. But, in short, as a result of all these things, the 40 boxes per month, the high turnover, the long period of time, there was a dwindling possibility. The further away you get from the recall, the less likely it was that any suture that might have been on the shelf remained available for use at the time of the surgery. Now, I made the point that, even within the recall population, there were a lot of sutures, obviously, which would not be contaminated. We don't know the numbers on that. We do know, however, that the reason for the recall, and the one that was supported by the FDA, was that Ethicon could not statistically assure the sterility of all of the sutures that were within that population of sutures that were recalled. Again, I just want to make the point that the fact that the suture was within the recall population, if it was, does not mean that it was a contaminated suture, and certainly doesn't mean that it was the cause of disinfection. And we've cited the Vaki case, which I think makes the point very well that you need more than just the fact of the recall to make the transition from the general proposition that some of these had the problem to the particular proposition that the one involved in this case had the problem. And that's just a pure logic evidentiary matter. Did the recall have as a cause that any of the sutures were, in fact, found to be contaminated, or just that Ethicon couldn't assure that they weren't contaminated? That is not in the record. I think you can assume that there must have been some good reason for Ethicon to believe that these were not sterile. So I think you can indulge that assumption. What I'm thinking, I don't know if it's in the record, and don't tell me if it isn't, is you could have a recall where Ethicon discovers that some machine that's supposed to test or some person that was supposed to test wasn't doing what they're supposed to, so it just doesn't know. Or you could have spot testing, and contamination turns up in the Petri dish or however they test these. The second thing that was on my mind was you could discover some sort of contamination, but it's not Morganella, or you could discover some sort of contamination, and it is Morganella. I wasn't able to find any of that. Is any of that in there? There is none of that in the record, Your Honor. There is no underlying evidence concerning what led to the recall. But you're right, those are two different scenarios that could have been. There are other scenarios. But there are different types of recalls, and I can just tell you that from general experience, that in some cases you do find that there's an actual problem, and you know the population of units that it's within, and you recall those units, and that would generate in some circumstances an inference that every single unit within that population was defective or had the problem. However, there are lots of other circumstances, especially in the public health area, where you just apply precautionary standards, and if you can't, as they said here, statistically assure the sterility, then as a result of being more cautious and abundance of caution, you would go ahead and recall them so that there was not even a potential problem out in the health field. And that may have been the circumstance. The language of the recall actually lends itself to that proposition, and that they did not actually find that those population at 3% that they did bring back were actually problematic. But I don't have anything in the record that I can really elaborate on with that. And then finally, I just want to talk very briefly about Dr. Lowe. As we made clear in the brief, and I think the record amply supports, he had very severe foundational and methodology problems with the way he went about reaching his opinions in this case. As a matter of fact, there was a first opinion that he had which went further to the ultimate fact, and it turned out that he faced- Do you have any problem with his opinions? Does he really say any more that is helpful to the plaintiff than that the infection is in the area where the sutures were applied? Frankly, no. I mean, I don't think that gets him where he needs to go. I think Judge Breyer was absolutely right that that just doesn't meet the standard and doesn't get you to a triable issue of fact. But at an abundance of caution, I can tell you that I think that his opinion, even as far as it goes, was unfounded and doesn't even amount to substantial evidence. I thought he had plenty of foundation to say infections in this type of surgery are quite rare, a half of 1% or whatever number he gave, some small number like that, and that the infection was indeed in this area. And that was about it, wasn't it? Well, that was about it. And I think I would grant you the first point that perhaps he has the expertise to talk about how rare the infection is, although he is not a disease specialist and he's not a cardiac surgeon, and he really didn't state any substantial basis for that opinion. But the second opinion, that the infection occurred in the area of the sutures, in addition to being next to meaningless, I also think it was unfounded. The fact of the matter is the record does not reveal that Dr. Lowe ever observed the infection, especially opened up. He was not part of the team in the operating room for either the June 1995 surgery, which was before infection, or the July 3, 1995 surgery, which was to explore the wound and see the infection. What he was basically relying on was just an operative report. So not being a cardiac surgeon and not being a disease specialist and merely relying on an operative report, and especially given what he had been relying on previously and his failure to state any other foundation for the opinion, I think it's even questionable whether he had the foundation to opine, as a substantial evidence matter, that the infection was in the area of the sutures. But, again, I demur to it. Even if it was in the area of the sutures, it doesn't mean it was a contamination problem. It doesn't raise a tribal issue. Thank you, counsel. Thank you. Young v. Ethicon is submitted, and we are adjourned.
judges: Canby, Kleinfeld, Rawlinson